**CONNELLEE et al. v. MAGNOLIA PETROLEUM CO. (No. 70.)***

(Court of Civil Appeals of Texas. Eastland. Dec. 18, 1925. Rehearing Denied Jan. 15, 1926.)

**1. Mines and minerals ⬅⟿79(3)—Lessee held required to account to lessors for one-eighth of gasoline manufactured from casinghead gas; "oil."**

Casinghead gas is a constituent of "oil"; and lessee, under lease providing for delivery to lessor's credit of one-eighth of oil produced, must account to lessor for one-eighth of gasoline manufactured out of casinghead gas produced.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Oil.]

**2. Contracts ⬅⟿53—Gross inadequacy of consideration, under some circumstances, will entitle wronged party to equitable relief.**

Though mere inadequacy of consideration will not of itself void a contract, under some circumstances, gross inadequacy of consideration will entitle wronged party to equitable relief.

**3. Contracts ⬅⟿53—Contract may be so grossly inadequate and unconscionable as to render it unenforceable.**

A contract may be unconscionable or consideration so inadequate as to render it unenforceable and void.

**4. Judgment ⬅⟿256(1) — Trial ⬅⟿340(1) — Trial court must enter judgment on verdict, and error corrected only by setting verdict aside and granting new trial.**

The trial court is required to enter judgment in conformity with jury's verdict, and any error may only be corrected by setting aside verdict and granting new trial.

**5. Mines and minerals ⬅⟿79(7)—Evidence held to sustain finding that provision for payment for casinghead gas used unconscionable and void.**

Evidence that lessees manufactured and sold thousands of dollars worth of gasoline from casinghead gas, and that lessors believed casinghead gas could be used only for fuel purposes, *held* to sustain finding that provision in lease for payment of $25 per year per well for casinghead gas was unconscionable and void.

**6. Evidence ⬅⟿5(2)—Common knowledge that in 1917 value and use of casinghead gas, except for fuel purposes, unknown.**

It is a matter of common knowledge that in oil fields of Texas in October, 1917, value and use of casinghead gas was unknown, except for fuel purposes.

*Writ of error granted February 24, 1926.

**7. Mines and minerals ⬅⟿79(3)—Lessors held entitled to one-eighth of gasoline made from casinghead gas, without being chargeable with any proportionate cost of development of oil lease.**

Lessors, entitled under lease to one-eighth of oil, are entitled to one-eighth of gasoline manufactured by lessee from casinghead gas, without being chargeable with proportionate cost of development of lease.

Appeal from District Court, Eastland County; Geo. L. Davenport, Judge.

Action by Earn T. Connellee and others against the Magnolia Petroleum Company. From a portion of the judgment in favor of defendant, plaintiffs appeal. Reversed, and remanded for new trial.

Burkett, Orr & McCarty, of Eastland, for appellants.

Conner & McRae, of Eastland, and W. H. Francis, A. S. Hardwicke, and Walace Hawkins, all of Dallas, for appellee.

RIDGELL, J. The nature and result of suit as stated in appellants' brief is as follows:

"This suit was instituted in the Ninety-First district court of Eastland county by appellants Earn T. Connellee et al., plaintiffs below, suing Magnolia Petroleum Company, defendant below, for the recovery of a large amount of gasoline alleged to have been taken by defendant from plaintiffs' premises under a lease contract executed by T. W. Connellee and wife, Tiny S. Connellee, Earn T. Connellee, Dixie Williamson, and Jack Williamson, as lessors, in favor of Magnolia Petroleum Company, lessee, on October 29, 1917; plaintiffs alleging that defendant took all of said gasoline without making payment for any part thereof."

The portion of the lease contract in controversy in this case reads as follows:

"Royalties herein agreed upon and specified, viz. one-eighth of all oil produced and saved, to be delivered free of charge into the tanks or pipe lines to the grantors' credit, for each well producing gas only sold or used off the premises, $200 per year; for casinghead gas, when sold or used off the premises, $25 per year for each well, the payment for gas to be made quarterly in advance, for all other minerals one-eighth of the net profits thereof."

Plaintiffs' petition is composed of five grounds for recovery and is in the form of one principal allegation and four alternatives. The first allegation sets forth the above-mentioned oil and gas lease, and the terms thereof, and states that the defendant has taken from said premises a large amount of gasoline, the exact amount of which is unknown to them, but, upon information and belief, allege said amount to be 17,000,000 gallons, and worth, at the time it was taken, $2,210,000. They further allege that said oil and gas lease contract did not contemplate the manufacture of gasoline and did not cover such substance, and therefore that plaintiffs are entitled to the full value thereof.

In the first alternative they allege that defendant did not "use or sell casinghead gas from said land off the premises," but that it converted same to its own use and benefit on the premises, and that the reasonable market value of the casinghead gas at the time it was made into gasoline and at the time of the conversion was the value above set forth, which was the value of the gasoline less the cost of separation, which they allege was $40,000. They then pray for a recovery of the full value of the gasoline, less the cost of separating same from the casinghead gas.

In the second alternative they say that it was not in contemplation of the parties to said oil and gas lease that casinghead gas which might be found or taken from said land should or would be made into gasoline, and that the contract did not cover such use of the casinghead gas; that plaintiffs were wholly ignorant of the great value of the same for such purposes; and that, by reason of such ignorance, there was no meeting of the minds of the parties, and hence no valid and binding contract was entered into relative to said casinghead gas for gasoline purposes. They further allege in this connection that they did not know at the time of executing said lease that casinghead gas was oil, and that it constituted the constituents of oil, and that, had they known this, they would not have signed the contract with the words "casinghead gas" used in the manner and in the connection in which it was used therein. They further say in this connection that, if the payment provided for each well producing casinghead gas should have been meant to cover rentals and royalties from casinghead gas used for the manufacture of gasoline, then that said sums so provided were wholly inadequate, inequitable, unjust, and unconscionable as a consideration, and that the consideration thereof wholly failed, and that a just and reasonable consideration would be one-fourth of the value of the casinghead gas, which amount they prayed for.

In the third alternative they allege that gasoline is a form of and a necessarily component part of oil and is oil, as that term is used in said lease contract, and that gasoline such as was produced from plaintiffs' premises is petroleum and oil under that term as used in said lease contract, and that said lease contract provided for the payment of one-eighth of the oil produced from said premises, and that, therefore, plaintiffs are entitled to one-eighth of all the gasoline produced and sold from said premises.

In the fourth alternative they allege that by the terms of said oil and gas lease, which provides for royalties as follows:

"One-eighth of all oil produced and saved to be delivered free of charge into tanks or pipe lines to the grantors' credit; for each well producing gas only sold or used off the premises, $200 per year; for casinghead gas, when sold or used off the premises, $25 per year for each well, the payments for gas to be made quarterly in advance, for all other minerals one-eighth of the net profits thereof," ·

—they would be entitled to one-eighth of the gasoline by reason of the provision in said contract "for all other minerals one-eighth of the net profits thereof," since gasoline is neither oil nor gas.

Plaintiffs further allege that the defendant had constructed its gasoline plant on plaintiffs' premises without permission and without ever having made any payments for the use of plaintiffs' land for such purpose, and sued for the rental value of the plant site.

The defendant answered by general demurrer and general denial, and, by way of special answer, alleged that it had paid a valuable consideration for said lease, and that upon the purchase thereof the legal title vested in defendant in and to all of the materials; that when said minerals were brought to the surface they ceased to be a part of the realty from which they were taken, and became personal property, and that having so acquired the legal title to said minerals and having performed all the precedent acts necessary to acquire title thereto, after they were brought to the surface, it owned a twofold title to said minerals, and owed the plaintiffs no duty with reference thereto other than the payment of the royalties stipulated, and that after the discovery of said minerals this obligation became and was nothing more than an obligation to pay debts.

Said answer further alleges that defendant had paid all the rentals and royalties provided in said contract, viz. one-eighth of all the oil produced and saved, $200 per year for each well where gas only was found, and $25 per year for each well producing casinghead gas, and further states that the grant is plain, explicit, and unambiguous, and not subject to the construction sought to be placed thereon by plaintiffs; that by the terms of such grant it became the owner of all of the gas of whatever kind or character and of all the oil and all the elements or parts thereof, including gasoline, etc., which might be derived therefrom by process of manufacture.

In said answer it is further contended that, in the event the court should hold said contract was in any respect uncertain and ambiguous, then that the plaintiffs had accepted royalties and rentals in full settlement of all claims which they might have, and were thereby estopped from denying that the payment of royalties and rentals were the complete and final settlement of any claim which they might have for casinghead gas.

Said answer further alleges that the gas used by it for manufacturing purposes was at the mouth of the wells and in its original state of insignificant and inconsiderable value; that it used and appropriated said gas in perfect good faith and under a claim of ownership, and, by the addition of a vast amount of labor and the application of a

large amount of capital, a finished and merchantable product was produced by it from said casinghead gas; that the value of said finished product is many hundred times the value of said gas in its original state; and that, even though it had not been the owner of said gas when it was used and appropriated by it, nevertheless it is the owner of said liquid manufactured therefrom, and the title to said finished product vested immediately and irrevocably in the defendant by virtue of the doctrine and principles of adjunction, accession, and specification, which doctrine is invoked.

Defendant further interposed the defense of limitation, stating that it had completed the erection of its plant on the 1st day of December, 1919, and had continuously used such casinghead gas as material from which to manufacture a volatile liquid (which we term gasoline) until the present time, and that plaintiffs did not file their petition in this cause until the 17th day of May, 1923.

Plaintiffs filed a supplemental petition containing a general denial of all allegations of new matter contained in defendant's answer.

The cause was tried before a jury upon special issues, all of which special issues were, by the jury, answered in favor of the plaintiffs. Both plaintiffs and defendant filed motions for judgment, and the courts thereupon rendered judgment in favor of plaintiffs for the rental of the plant site in accordance with the findings of the jury upon this issue, but stated that the other findings of the jury would be disregarded by the court as being wholly immaterial to the judgment which should be rendered, and thereupon rendered judgment in favor of the defendant, denying plaintiffs any of the relief sought, except in connection with the rental value of the plant site.

Plaintiffs filed their motion for a new trial in due time and the same was, by the court, overruled. Both plaintiffs and defendant filed assignments of error and bills of exception, each giving notice of appeal, and the case is now brought before this court for review.

The appellants' first four propositions will be grouped and treated together for the reason they involve the same question; the said propositions being as follows:

First Proposition.—Gasoline is oil under the term "oil" as used in the lease contract.

Second Proposition.—Casinghead gas and gasoline are the same except for the residue gas contained in the former; said residue gas containing the same elements as ordinary dry gas.

Third Proposition.—Residue gas left after separating gasoline from gas coming through the casinghead is still "casinghead gas" as that term is used in the lease contract.

Fourth Proposition.—Where a lease contract provides for the payment of royalties and rentals to lessors of "one-eighth of all oil produced and saved * * *; for each well producing gas only, sold or used off the premises, $200 per year; for casinghead gas, when sold or used off the premises, $25 per year for each well, the payment for gas to be made quarterly in advance," and the lessee operating under said lease separates the gasoline from the casinghead gas on the premises, lessors are entitled, under the terms of the lease, to one-eighth of the gasoline and to $25 per well for the residue gas when it is sold or used off the premises.

The court submitted the jury special issue No. 6, which is as follows:

"Is the casinghead gas oil, as that term is used in the lease contract offered in evidence in this case? To which the jury answered, "Yes; a part."

There was a great deal of expert testimony offered by both parties on the question of whether casinghead gas was oil, and we feel disposed to quote at length testimony of the main scientific witnesses upon that point:

The witness R. E. Barker testified as follows:

"I am engaged in the manufacture of casinghead gasoline. I have been engaged in that work about 3½ years. In my opinion casinghead gas is a part of oil. I have heard of people blowing lean natural gas or high pressure gas into a well for the purpose of picking up hydrocarbons from the sand or from the oil and then recovering it again as wet gas. I stated, on direct examination, when I was asked as to whether or not casinghead gas was a part of oil, that I thought it was, and as to whether or not I meant by that, that casinghead gas had some of the constituent elements that are included in crude oil, casinghead gas as we have described it here is composed principally of the same elements that go to make up gasoline, that is, pentane, heptane, hexane, and butane. Of course, that gas when manufactured or when used in a plant for the manufacture of gasoline, a large part of this element is consumed in the manufacture. As to whether or not I mean to say that this casinghead gas that comes out of the well at the casinghead is the same thing as liquid petroleum, I say that part of it that may be extracted and converted into gasoline has the same elements."

The witness Alexander Clark testified as follows:

"I am engaged in the gasoline business. I have been in that business since 1906. I have been actively engaged in the designing of plants and operation of gasoline extraction plants for about 18 years, both absorption and compression plants. In my experience with gasoline plants I have had experience with casinghead gas, during that period of time.

"Casinghead gas is a mixture of various hydrocarbons. Crude oil is also a mixture of various hydrocarbons. The difference between the hydrocarbons composing casinghead gas and those composing oil is the difference that goes in ratio of one atom of carbon and two atoms of hydrogen all the way through the mixture of both crude and casinghead gasoline. The hy-

drocarbons composing casinghead gas run up to what we might say hexane or octane, where there are six atoms of hydrogen and ten atoms of carbon present in the mixture with the highest liquefiable hydrocarbon that would be present in the form of gas. While the hydrocarbons composing crude oil are normally in a liquefied state that contain greater number of carbon atoms and a greater number of hydrogen atoms. They are the only difference, that there are greater numbers. I frankly believe that both oil and gas—casinghead gas—as they exist in the producing sand, are of similar construction and under the conditions in which they' exist, under pressure, conditions, the parts forming casinghead gas are liquefiable, and they are all in the producing sand as a liquid, a part of the crude. They are part of the oil. Casinghead gas is part of the oil."

One of defendant's witnesses, Dr. Sellards, testified as follows:

"As to why it is you can't have casinghead gas unless you have oil present, I have explained to you that these substances that you have mentioned to me exist, and that means exist in part liquid; in part gas. When you are talking about casinghead gas, you are talking about gas, part of these substances. It is petroleum gas. * * * Gasoline is made out of the several hydrocarbons in the casinghead gas that are heavy enough to make gasoline. Gasoline is contained in oil. * * * Gasoline is in casinghead gas. * * * I stated that gasoline is a mixture of light hydrocarbons. Oil is a mixture of light hydrocarbons. Casinghead gas is a mixture of lighter hydrocarbons existing in a gaseous state or condition. * * *"

Defendant's witness, Dr. Weiser, testified as follows:

"Methane and ethane is what we call dry gas. You can take dry gas, methane and ethane, and force them through the light crude oil, and then when it comes out it will contain parts of the light hydrocarbon of the crude oil.

"You can take gasoline, casinghead gasoline, or naphtha, whatever you call it, and manufacture it out of the casinghead gas. It goes through your plant and it contains considerable of the light hydrocarbon that methane and ethane have, the casinghead gas does. The casinghead gas goes through your plant, and, as it goes through the plant, the plant takes away the lighter hydrocarbons of methane and ethane, and they pass on through as residue. That is right. * * *"

Defendant's witness, Dr. Schock, testified as follows:

"As to whether or not the oil vapor that rises from the oil is oil vapor and had been part of the oil, it can have been a part of the total oil in the ground. * * *

"The smallest hydrocarbons are—the smallest molecules are methane and next comes ethane. Methane is the lightest of hydrocarbons, and then ethane is next. You can take methane and ethane and force them down into a well, down into the earth, and let it go through another well some piece away after having passed through this oil sand, and it comes out as casinghead gas in another well because of the fact

that it contains heavier hydrocarbons along with the methane and ethane. That is one possibility. You can pass lean gas through oil and it is enriched.

"Casinghead gas in the ground' is part of the unrecoverable oil because they were all produced together. It is part of the unrecoverable oil in the ground, but to what extent it would be gas and to what extent it would be an oil cannot be foretold until it comes out.

"* * * Generally, dry gas is made up mostly if not wholly of methane and ethane with possibly varying small amounts of others in small proportions, while wet gas has these in smaller proportions; and the heavier hydrocarbons in larger proportions. Dry gas is a gas that is ordinarily composed of those two. The terms wet and dry gas are terms that have been applied to these different kinds of gases since they have been manufacturing gasoline. * * * Ordinarily, over these fields here, the gas well produces larger volume of gas than gas from an oil well.

"After the substance from a well has been passed through what we call the casinghead gasoline plants, and gone through a manufacturing process, there is a residue; that is, gas. * * * The residue gas that is left after the casinghead gas is run through the plant and put through the process of manufacture, that gas is part of the constituents of casinghead gas."

[1] The paramount issue involved in this appeal is whether, as contended by appellants, casinghead gas is oil, and, if so, whether, under this lease contract, the appellants are entitled to recover their royalty for gasoline manufactured from the casinghead gas taken from the lease premises. We believe that the matter has been settled finally by our Supreme Court refusing a writ of error in the case of Livingston Oil Corporation v. Waggoner (Tex. Civ. App.) 273 S. W. p. 903. While learned scientists may advance all kinds of theories as to the origin of oil and gas, of its constituent elements, and may attempt to separate the two as different minerals, in order that conclusion might be drawn that they are not one and the same thing in the general accepted theory of the terms, yet boiled down as we glean from the testimony in this case, the kinship and relation is such that divorcement cannot be supported in fact or law. We are therefore justified in the conclusion, not only as found by the jury, that casinghead gas is oil in part, but that casinghead gas is a constituent of oil.

It might be interesting as well as serve a better understanding of the testimony and issues in this case to quote the following from brief of appellee as to the origin of oil and gas:

"None other than the Infinite Mind knows the origin of these substances. The accepted theory is they spring from a combination of inorganic and organic matters. Time is recorded by geologists in terms of millions of years, and to occurrence of past geologic events they identify the period as 'a long time ago.' A long time ago, how many millions of years we are

left to conjecture, the earth wherein now is found oil and gas was a sea, lake, lagoon, or swamp. The records show that Eastland and adjoining counties at that time were covered by a rather shallow sea, inhabited with marine animals of different kinds, particularly whales, and in addition to the animals in the sea there were seaweeds and vegetation in and on the banks of the sea, swamps, and lagoons, adjacent thereto. Upon death these marine animals would sink to the bottom of the water, and the decaying and dead vegetation upon the banks of said water were washed into and deposited with the remains of the animals. When the dead animals and vegetables sunk down to the bottom, they were quickly submerged by ooze or mud, which prevented their decomposition if exposed to the air. They were in a rough sense preserved against ordinary decomposition such as we are familiar with on the surface of the earth. The earth filled in and was raised above the sea inbedding these matters. The remains of the marine and vegetable life, being under great pressure and high temperature in the earth, underwent changes which led to the formation of oil and gases; some of the decomposition resulting in gaseous components, and some in components which go to make up oil. Oil, gas, and casinghead gas were so formed and they were formed simultaneously side by side."

All these theories as to the origin of oil and gas, its cause of being placed deep in the earth, are but speculation and more or less guess work. It is the creature of Him who made all things, and the mystery of its formation and creation is not of the perfect understanding of human minds.

From the testimony of the witnesses and the findings of the jury, we must conclude that casinghead gas is a constituent element of oil, and we believe the trial court under the testimony and findings of the jury should have required appellee under this lease contract to account to appellants for one-eighth of all the gasoline manufactured out of casinghead gas from this lease. In this conclusion we are supported by the Livingston Case, supra, as well as the following authorities: Twin Hills Gasoline Co. v. Bradford Oil Co. (D. C.) 264 F. 440; Wemple v. Producers' Oil Co., 145 La. 1031, 83 So. 232; Thornton on the Law of Oil and Gas (4th Ed.) § 137B; Locke v. Russell, 75 W. Va. 602, 84 S. E. p. 948; Gilbreath v. States Oil Corporation (C. C. A.) 4 F.(2d) p. 232. Reynolds v. McMan Oil & Gas Co., 279 S. W. 939, just decided by this court; the dissenting opinion of Justice Kennamer in the case of Hammett Oil Co. v. Gypsy Oil Co., 95 Okl. 235, 218 P. 506, 34 A. L. R. 275.

The Livingston Case disposes of this question in plain, forcible and unmistakable language, and we do not feel that we can add to the sound reasoning for the conclusions announced in that case. The Gilbreath v. States Oil Corporation supports and is in point with the Livingston Case. The other cases cited are in accord, approve, and sustain the hold-ing. The declaration in all those cases that casinghead gas is oil springs out of a condition and facts uncontroverted, a history of petroleum unchallenged and proof evidenced by experience, analysis and observation from which legal conclusion there is no escape.

We now consider briefly in group propositions 9 to 14, inclusive, made by appellant, because each relate and raise the question of legality and construction of the written lease involved. The appellants contend that the provision for payment of $25 per year for the casinghead gas sold or used off of the premises is not only void in the application attempted to be made, but that same does not include the use made by appellee and does not deny and preclude a recovery for the gasoline manufactured from the casinghead gas.

[2] While mere inadequacy of consideration of itself will not void a contract, still, under some circumstances, gross inadequacy of consideration in a contract will entitle a wronged party to equitable relief from the terms of the contract.

[3] It is further true that a contract may be unconscionable or so grossly inadequate that same is rendered unenforceable and void; it is generally accepted that, where the consideration in a contract is so grossly inadequate, unjust, and oppressive as to shock the conscience, that no man in his senses or else under a delusion or undue influence would make, or where by its terms it is so counter to reason and fairness, and so grossly inadequate that unfairness, imposition, and fraud would by the circumstances and facts be strongly presumptive and arise, and therefore afford a satisfactory ground for annulling the contract. Burch v. Smith, 15 Tex. 219, 65 Am. Dec. 154; 13 Corpus Juris, pp. 366, 612.

The jury, in answering special issue No. 11, answered that it was not contemplated by the parties that gasoline would be manufactured from the casinghead gas and that gasoline content was not included in the $25 a well per year.

In answering special issue No. 12, the jury found that $25 per year for wells producing casinghead gas was a gross inadequate consideration.

By counterpropositions, the appellees insist as follows:

Fourth Counterproposition.—"The contradicted evidence showing that defendant has not produced nor mined from the oil, gas, and minerals granted, other concrete products and substances that 'oil,' 'casinghead gas,' 'gas' from wells producing gas only * * * no royalty on gasoline manufactured from casinghead gas is due by reason of the royalty imposed on 'other minerals.'"

Fifth Counterproposition.—"By the terms of the granting clause in the mineral deed title to 'all the oil, gas, and other minerals in and under' plaintiffs' land vested in the defendant in place and when produced and saved by virtue

of the down payment of $7,620 and the obligation to drill and pay royalties."

The obligation to pay the royalty arises under the terms of the lease by reason of the same provision that obligates the payment of royalty for the oil because casinghead gas is oil.

We believe without entering any extended discussion that the finding that casinghead gas is oil, that the facts support the jury's verdict that the consideration was grossly inadequate, and that it was not contemplated by the parties that gasoline would be manufactured from the casinghead gas, and, futher, that the gasoline manufactured herein could come within the term "other minerals" provided in the lease, and that the appellants are entitled to recover their one-eighth royalty for the gasoline manufactured from the casinghead gas, disposes of appellee's counter-propositions, and same are therefore overruled.

By proper assignments the appellants insist that the trial court committed error in disregarding the verdict of the jury and rendering judgment for appellee "non obstante veredicto."

The trial court, in the judgment, states as follows:

"Such judgment will be rendered irrespective of such findings of the jury and will be based on the undisputed testimony now before the court."

[4] It is the settled law of this state that the trial court shall enter judgment in conformity with verdict of jury and any error may only be corrected by setting aside verdict and granting a new trial.

It is not necessary to quote the testimony, but suffice to say that same supports the finding of the jury as to both issues.

[5] The facts show that appellee manufactured and sold thousands of dollars worth of gasoline which was taken and extracted from casinghead gas, for which they contend they were to pay under the lease $25 per year from each well.

The jury, under the facts in this case, were fully authorized and sustained in finding that this contract was unconscionable, and that the provisions to pay $25 per year for this casinghead gas, as used, would come under the condemnation and denouncement of a void contract.

The appellants' testimony shows that they did not know the difference between gas and casinghead gas, and believed that both could only be used for fuel purposes. They did not know, when lease was executed in October, 1917, that gasoline could be manufactured from casinghead gas.

[6] We believe that it is a matter of common knowledge that in the oil fields of Texas, at the time this lease was executed, the value and use of casinghead gas was unknown, save and except for fuel purposes, and that the great value and use now made has come into

its own in the last few years. It may be that appellee knew of this valuable use, but it was not generally known by the public.

It was not contemplated by all parties that the casinghead gas would be used in the manufacture of gasoline, and this lease really only contemplated and the appellants so understood that this payment of $25 per year was for casinghead gas sold and used off of the premises for fuel purposes only, and we conclude that the appellants converted and used same in this case in violation of the spirit as well as the terms of the lease contract. It follows, therefore, that appellee is required under the provisions of the contract to atone and account to appellants for one-eighth of the gasoline so manufactured out of casinghead gas from the leased premises.

This is a correct procedure, for, if trial courts could disregard the verdict of a jury and render judgment as they believe the facts to be, it would tend to destroy the rights and guaranty of a jury trial. On the other hand, the law provides how the trial court shall protect and correct against an unauthorized or unjust finding of the jury, and that is by granting a new trial.

The court should have entered judgment in response to the verdict of the jury. Fant v. Sullivan (Tex. Civ. App.) 152 S. W. 515; Thornton v. Bank (Tex. Civ. App.) 252 S. W. 278; Taylor v. Davis (Tex. Civ. App.) 234 S. W. 104; Lemm et al. v. Miller et al. (Tex. Civ. App.) 245 S. W. 90; Dickson v. Kilgore State Bank (Tex. Com. App.) 257 S. W. 867; Bateman v. Cleghorn (Tex. Civ. App.) 266 S. W. 422; Massie v. Hutcheson (Tex. Com. App.) 270 S. W. 544.

[7] Appellants insist that the court committed error in admitting proof of the cost of drilling wells on lease. The evidence admitted showing that appellee expended $671,-962.15, in development of the lease.

As we view this case, it was immaterial inquiry as to this cost. If we are correct that, by the terms and construction of this lease contract, appellants are entitled to recover as royalty one-eighth of gasoline manufactured from the casinghead gas, then they would not be chargeable with any apportionate or proportionate cost of development, but this cost was assumed by appellees in lease and the royalties are due appellants.

We therefore sustain the assignment, and evidence so admitted was, no doubt, harmful and injurious, and, under the law, would not be a set-off or charge against appellants.

We have been greatly aided by the able briefs and presentation of this case by the attorneys for both parties. At the time this suit was tried, the Livingston Case was not a guide for the trial court, for we feel sure that the judgment would have been different and the trial court would have been persuaded like this court to adopt and apply the principle of law in that case.

The other assignments insisted upon will

likely not occur again, and, as this case is to be reversed and remanded, we forbear further discussion.

While an exact lease like the one involved has never, as we understand, been before the appellate court for construction, yet the reason and the law in the cases we have followed applies, controls, and underlies the foundation of this suit.

The leases in the cases we are following contained no provision for specific payment of rental for casinghead gas, but, having concluded as we have that casinghead gas is oil, we are justified, we believe, in our holding and adjudging that appellants are entitled to the royalty for gasoline so manufactured from casinghead gas taken from this lease.

As the record is not in such condition that final disposition can be made of this case in this court, it is our judgment, and it is ordered that this cause be reversed and remanded for a new trial.